<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| STEPHEN SILVER, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 04-816 |
| | : | |
| v. | : | |
| | : | |
| WESTINGHOUSE ELECTRIC CORP., | : | <u>OPINION</u> |
| ASEA BROWN BOVERI, INC., | : | |
| VIACOM, INC., SIEMENS | : | |
| WESTINGHOUSE POWER CORP., | : | |
| | : | |
| Defendants. | : | |

**RODRIGUEZ,** Senior District Judge:

This case has come before the Court on Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Because Defendants are immune from liability by operation of New Jersey's statute of repose, N.J. Stat. Ann. § 2A:14-1.1, the motion will be granted.

**I.  BACKGROUND**

Plaintiff Stephen Silver filed suit in this Court on February 24, 2004, asserting strict liability in tort, negligence, and breach of warranty claims that allegedly arose from a May 15, 2002 accident at the Public Service & Gas ("PSE&G") electrical substation in Woodbury, New Jersey. Plaintiff was in a team of two PSE&G relay technicians and two substation mechanics who were performing routine maintenance at the substation. In making a change in the metal clad switchgear for a transformer, the team attempted to verify that the current transformer or "CT" ratio change was correct, when an electric "flash" occurred, severely burning Plaintiff.

Defendants have been sued because they designed, manufactured, distributed, installed, and/or sold the metal clad switchgear and/or its component parts, which Plaintiff claims were defective and unreasonably dangerous. First Amended Complaint ¶ 5, 7, 10. PSE&G utilized the switchgear assembly to carry out the sole purpose of the Woodbury substation's construction, stepping-down 26,000 volts of electricity so that this essential power could be safely and efficiently transmitted to and consumed by PSE&G customers.

In the 1950s, PSE&G contracted with Defendants to design and fabricate electrical transmission equipment for four PSE&G substations, including the Woodbury substation, where equipment included a three-transformer lineup of metal clad cubicles, or switchgear assembly, into which were horizontally installed medium-voltage air circuit breakers. PSE&G provided the specifications for the Woodbury substation's switchgear assembly, and Westinghouse designed a switchgear assembly suited for the Woodbury substation, which it then developed, fabricated, and distributed to PSE&G. See November 30, 2005 Expert Report of Ray Ratica at pp. 2-3; October 18, 2005 Expert Report of Richard D. Brugger at p. 5; February 17, 2006 Affidavit of Raymond Ratica ¶¶ 3-7. Westinghouse did not install the assembly.

The switchgear assembly in question consists of eighteen cubicles, arranged adjacent to each other, spaced four feet apart, and connected to each other by a series of rigid 4,160 volt main bus sections running through each cubicle and connecting cubicle to cubicle. November 30, 2005 Expert Report of Ray Ratica at p. 2. Three of the eighteen cubicles are dedicated to receiving incoming power from the three transformers, and redistributing that power internal to the switchgear line-up, via the

main bus, to the fifteen feeder cubicles.  Id.  The fifteen feeder cubicles are configured to feed power out of the Woodbury substation to PSE&G customers, to feed capacitor banks, and to act as a tie feeder.  Id.  The three cubicles which receive incoming power from the three transformers each approximately measure four feet wide, by twelve feet deep, by ten feet high; the other fifteen feeder cubicles approximately measure four feet wide, by twenty-eight feet deep, by ten feet high.  Id. at p. 3.  Since its mid-1950's installation, each of the three cubicles of the switchgear assembly has remained affixed to its own concrete foundation, caulked into place.  Id.  The main bus work interconnects all eighteen cubicles via an overhead metal enclosed bus structure, and the power which exits the substation leaves each cubicle through underground cable which penetrates each cubicle's concrete foundation and continues to run underground to exit the substation.  Id. at p. 3.

## II.  DISCUSSION

Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law."  Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c).  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Credibility determinations are the province of the factfinder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

Analysis

New Jersey's statute of repose limits an action for recovery of damages for a deficiency in the design of an improvement to real property:

> No action, whether in contract, in tort, or otherwise, to recover damages for any deficiency in the design, planning, surveying, supervision or construction of an improvement to real property, or for any injury to property, real or personal, or for an injury to the person, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property . . . shall be brought against any person performing or furnishing the design, planning, surveying, supervision of construction or construction of such improvement to real property, more than 10 years after the performance or furnishing of such services and construction. This limitation shall serve as a bar to all such actions . . . .

 N.J. Stat. Ann. § 2A:14-1.1(a).  Thus, to invoke the protection of the statute of repose, Defendants must demonstrate that the injury sustained by Plaintiff allegedly resulted from a defective and unsafe condition of an improvement to real property of which Defendants were responsible for performing or furnishing the design, planning, surveying, supervision of construction, or construction.  Dziewiecki v. Bakula, 853 A.2d 234, 236 (N.J. 2004) (noting that "products" are not improvements to real property, so swimming pool kit manufacturer was not protected by statute, but construction company that installed the kit into the ground so it became a permanent improvement to real property was protected).

In this case, it is undisputed that the Plaintiff's injury occurred more than ten years after Defendants played any role regarding the switchgear assembly at issue. It is also undisputed that Plaintiff complains that the switchgear assembly was in a defective and unsafe condition. The remaining issue is whether the switchgear assembly is an improvement to real property which Defendants were responsible for performing or furnishing the design, planning, surveying, supervision of construction, or construction.

The Superior Court of New Jersey, Appellate Division, determined that a transfer switch assembly cabinet and its internal components constituted an improvement to real property which falls within the protection of the ten-year statute of repose. Brown v. Central Jersey Power & Light Co., 394 A.2d 397, 405-06 (N.J. Super. Ct. App. Div. 1978). The court looked to the intent of the statute and noted,

> the intent of the language of the statute was to protect those who contribute to the design, planning, supervision or construction of a structural improvement to real estate and those systems, ordinarily mechanical systems, such as heating, electrical, plumbing, and air conditioning, which are integrally a normal part of that kind of improvement, and which are required for the structure to actually function as intended.

394 A.2d at 405. Accordingly, because the assembly "constituted a permanent part of one of the mechanical systems necessary to the normal function of the particular improvement to real estate," the statute of repose barred any cause of action. Id. at 405-06. See also Wayne Twp. Bd. Of Educ. v. Strand Century, Inc., 411 A.2d 1161 (N.J. Super. Ct. App. Div. 1980) (finding, for purpose of the statute of repose, a dimmer panel for a high school auditorium stage wired to operate the stage systems and projection room was an improvement to real estate, an integral part of the permanent electrical system of the structure, and required for the system to actually function as intended).

6

Like the transfer switch assembly cabinet in Brown, the metal-clad switchgear cabinets here are permanent parts of the mechanical system necessary to the normal function of the substation.  See also Woessner v. Air Liquide, Inc., 242 F.3d 469 (3d Cir. 2001) (motor control center at carbon dioxide recovery plant was an improvement to real property, rather than 'production machinery' so as to invoke application of Delaware's statute of repose).  Because the Court finds that the metal clad switchgear assembly, including the cabinets and their internal components, are essential to the function of the substation and its basic systems and were designed to be a permanent part of the substation, it is satisfied that the assembly is an improvement to real property within the purview of the statute of repose.

Plaintiff has attempted to argue that there remains a question of fact as to whether Defendants "designed" the metal clad switchgear assembly; rather, Plaintiff contends that Defendants manufactured and supplied a multitude of switchgear assemblies, rendering them "products."[1]  The Court is not persuaded by such an argument in this case.

---

[1] Plaintiff's expert has submitted a verification in opposition to the instant motion stating, "[t]he piece of metal-clad switchgear on which [Plaintiff] was injured is a standard piece of equipment manufactured by Westinghouse." January 27, 2006 Verification of Richard D. Brugger, ¶ 4.  Yet, after referring to the switchgear units as "uniform manufactured," he went on to state that the PSE&G specifications for its Subclass "C" substations showed how the cabinets were to be externally configured and interconnected, while Westinghouse reserved the internal design to itself, albeit by using standard "building blocks."  Id. at ¶ 5, 8.  Similarly, the substation supervisor submitted a verification indicating that the Subclass "C" " substations have *essentially* the same configurations," January 30, 2006 Verification of Thomas Woods, ¶ 5 (emphasis added), and although "the internal equipment within any particular piece of metal-clad switchgear at Subclass "C" stations is *basically* generic," "[t]here are differences in how the metal-clad switchgear cabinets are arranged and/or connected."  Id. at ¶ 7 (emphasis added).

"The fact that injury was caused by a mass-produced, brand-name item does not in and of itself render the statute of repose inapplicable." Diana v. Russo Dev. Corp., 799 A.2d 689 (N.J. Super. Ct. App. Div. 2002).  Further, although Plaintiff has established that PSE&G has sixty-nine Westinghouse Subclass "C" substations, including the one at Woodbury, Plaintiff's own expert has acknowledged that Defendants are being blamed in this case for allegedly defective "equipment design." See, e.g, October 18, 2005 Expert Report of Richard D. Brugger at p. 3.  Finally, regardless of the number of Subclass "C" substations PSE&G maintains, it is uncontroverted that Westinghouse was required to modify its standard switchgear lineups, alter the standard design for individual switchgear cubicles, and increase the pole spacing for circuit breakers in order to meet PSE&G's Subclass "C" specifications. February 17, 2006 Affidavit of Raymond Ratica ¶¶ 8-11.  That is, for purposes of the statute of repose, Westinghouse designed the metal clad switchgear assembly.

### III.  CONCLUSION

For the foregoing reasons, because Defendants are immune from liability by operation of New Jersey's statute of repose, N.J. Stat. Ann. § 2A:14-1.1, the Defendants' motion for summary judgment will be granted.  An appropriate Order will be issued.


   /S/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ, U.S.D.J.


DATED: August 16, 2006

8